UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-21008-CIV-DIMITROULEAS/D'ANGELO

M. M., et al.,

      Plaintiffs,

vs.

VITROLIFE, INC., et al.,

      Defendants.

_____/

## OMNIBUS REPORT AND RECOMMENDATION

**THIS CAUSE** is before the Court on three motions.  First, Defendants Igenomix USA, Inc. and Vitrolife, Inc. filed Motions to Compel Arbitration on June 23, 2025 (DE 26, 27).[1]  On August 6, 2025, Plaintiffs M.M., Katie Herrero, Jaime Magnetico-Walsh, Y.C., Soupharack Vannasing, Evette Smith, and Courtney Zieller, individually and on behalf of all others similarly situated, filed their response in opposition (DE 36), and Defendants Igenomix USA, Inc. and Vitrolife, Inc. replied on August 22, 2025 (DE 39, 40).  Second, Defendant Vitrolife AB filed a Motion to Dismiss for Lack of Personal Jurisdiction and/or to Compel Arbitration on October 24, 2025 (DE 49).[2]  Plaintiffs filed their response in opposition (DE 54), and Defendant Vitrolife AB filed its reply on November 14, 2025 (DE 56, 57).  Having considered the Parties' arguments, the relevant legal authorities, and the pertinent portions of the record, and being otherwise fully

---

[1] On June 24, 2025, these Motions were referred the undersigned Magistrate Judge for an evidentiary hearing if necessary and appropriate disposition or report and recommendation (DE 28).

[2] On October 27, 2025, this Motion was referred to the undersigned Magistrate Judge for an evidentiary hearing if necessary and appropriate disposition or report and recommendation (DE 51).

advised in the premises, for the reasons stated below, it is respectfully recommended that Defendants Igenomix USA, Inc. and Vitrolife, Inc.'s Motion to Compel Arbitration be **GRANTED IN-PART and DENIED IN-PART**.  It is also respectfully recommended that Defendant Vitrolife AB's Motion to Dismiss be **GRANTED** for lack of personal jurisdiction.

## I.   FACTUAL BACKGROUND AND PROCEDURAL POSTURE

On March 4, 2025, Plaintiffs filed their proposed class action Complaint "as a result of the false, deceptive, unfair, and misleading advertising marketing, and promotion of Defendants' preimplantation genetic testing for aneuploidy" ("PGT-A testing") (DE 1 ¶ 1).[3]  PGT-A testing is marketed and sold by Defendants as an add-on to the in vitro fertilization process ("IVF") to screen embryos for chromosomal abnormalities (*id.* ¶ 9). "The IVF process begins with medication taken by women to stimulate the follicles to create several mature eggs for collection. Once the eggs are retrieved from the ovaries, they are then fertilized . . . with sperm to create embryos.  If the embryos reach the blastocyst stage, they are then ready for implantation to see if they will result in a pregnancy" (*id.* ¶ 8).  Essentially, "IVF clinics perform a biopsy and send a small number of cells from the embryo to [the company performing the] PGT-A testing and provide results to the customer and their clinic" (*id.* ¶ 9).  The results determine which embryos are best suited for implantation and which embryos are abnormal and not suited for implantation (*id.*).

---

[3] There are typographical errors throughout the Complaint.  For example, the Counts are not consecutively numbered, as there are two Counts labeled as Count Nine (*Compare* DE 1 at 86 with *id.* at 88).  There are also two Counts labeled as Count Thirteen (*compare id.* 85 *with id.* at 97). Additionally, the paragraphs do not continue consecutively—the top of page seventy-seven contains two paragraphs numbered 259 and 260, and then the next paragraph is numbered 200 (*id.* at 77-78).  On page seventy-nine, the paragraphs are numbered starting with 261, even though the previous paragraph is numbered 211. The inconsistent numbering can be found in several parts of the Complaint, making it difficult to identify specific paragraphs and counts by number.

According to the Complaint, Igenomix USA, Inc. ("Igenomix") operates a clinical laboratory and is a Florida corporation (*id.* ¶¶ 8, 9). Vitrolife AB acquired Igenomix in 2021 (*id.* ¶ 10). Vitrolife AB, Igenomix, and Vitrolife, Inc., collectively referred to in the Complaint as "Vitrolife," "offer[] 'pioneering genetic tests to help reproductive health professionals to diagnose and treat their patients at the preconception, pre-implantation and pre/postnatal phases of their reproductive journey with one aim: a healthy baby'" (*id.* ¶ 16). Plaintiffs allege that Vitrolife falsely markets and sells PGT-A testing as a "proven, accurate, and reliable method to decrease the chance of miscarriage and increase the chance of giving birth to a healthy baby" (*id.* ¶ 2). Vitrolife allegedly markets its PGT-A testing to people pursuing IVF to improve pregnancy rates, increase implantation rates, increase delivery rates, increase the chances of having a healthy baby, decrease the rate of miscarriages, while also "being superior to all others' testing" (*id.* ¶ 10). Indeed, Plaintiffs contend that Defendants "market their PGT-A testing as being more than 98-99% accurate" (*id.*). As a result, people pursuing IVF rely on these statements to purchase PGT-A testing from Defendants (*id.*). However, "[s]tudies show that when looking at clinic pregnancy, miscarriage, or live-birth rates, there is no difference between cycles utilizing PGT-A and cycles not utilizing PGT-A. Studies also show the accuracy rating for PGT-A is significantly lower than 98 to 99% accurate" (*id.* ¶ 11). Plaintiffs claim that they purchased Vitrolife's PGT-A testing based on Vitrolife's allegedly "false and deceptive marketing and advertising statements, and material omissions," causing them to suffer economic loss (*id.* ¶ 23).

The Complaint details the IVF process and the evolution of PGT-A testing (*id.* ¶¶ 25-110). Plaintiffs claim that despite scientific advancements finding the value of PGT-A testing inconclusive, Igenomix "materially omitted to inform their customers and potential customers of this important pronouncement by the leading organization for reproductive medicine" (*id.* ¶ 111).

Rather, Igenomix "continued to promote PGT-A to IVF patients, including by making the specific affirmative misrepresentations" about the effectiveness and benefits of the testing (*id.* ¶ 115). Vitrolife allegedly "continued to advertise, market, and affirmatively misrepresent non-existent benefits of PGT-A that are not supported by science to vulnerable consumers, while at the same time omitting material information concerning the efficacy of PGT-A [testing]" without conducting scientific studies (*id.* ¶¶ 127, 153, 176). According to Plaintiffs, by means of the statements and omissions set forth in the Complaint, Vitrolife's "false and misleading advertising and marketing statements . . . have played a key role in driving up the use of PGT-A testing in the United States" (*id.* ¶¶ 184-86).

Plaintiffs further claim that Vitrolife "provide[s] a Preimplantation Genetic Testing for Aneuploidy Consent Form ("Consent Form") that all customers are asked to sign prior to obtaining their PGT-A testing" (*id.* ¶ 197). The Consent Forms purportedly contain false statements and misrepresentations, which are seen and relied upon by Plaintiffs in deciding to purchase PGT-A testing (*id.* ¶ 198). "These statements in the Consent Form mirror the misleading and false marketing, promotion, and advertising discussed above, including that (a) PGT-A testing is 98% accurate, (b) PGT-A testing increases the chance of pregnancy, (c) PGT-A testing leads to a higher chance of a healthy pregnancy, and (d) PGT-A testing reduces the risk of miscarriage" (*id.* ¶ 199). As a result, Plaintiffs "were injured at the time of sale and would not have purchased PGT-A from Defendants had they been told the truth at the time of sale concerning the body of scientific knowledge about PGT-A and each of the detailed misstatements and omissions . . ." (*id.* ¶ 222).

Based on these allegations, Plaintiffs bring sixteen claims: (1) Violations of Massachusetts Consumer Protection Act in Count One, (2) Violations of Pennsylvania Unfair Trade Practices and Consumer Protection Law in Count Two, (3) Violations of Florida Deceptive and Unfair Trade

Practices Act in Count Three, (4) Violations of Maryland Consumer Protection Act in Count Four, (5) Violations of Connecticut Unfair Trade Practices Act in Count Five, (6) Violations of New York Consumer Protection Section 349 in Count Six, (7) Violations of New York Consumer Protection Section 350 in Count Seven, (8) Violations of California Unfair Competition Law under the Unfair and Fraudulent Prongs in Count Eight, (9) Violations of California Unfair Competition Law under the Unlawful Prong in Count Nine, (10) Violations of California Consumer Legal Remedies Act in Count Ten, (11) Breach of the Implied Warranty of Merchantability in Count Eleven, (12) Breach of the Implied Warranty of Usability in Count Twelve, (13) Fraud in Count Thirteen, (14) Fraud by Concealment in Count Fourteen, (15) Breach of Express Warranty in Count Fifteen, and (16) Unjust Enrichment in Count Sixteen (*id.* ¶¶ 201-377).[4]

## II.   **DISCUSSION**

On June 23, 2025, Defendants Igenomix and Vitrolife, Inc. filed their Motions to Compel Arbitration, contending that each Plaintiff signed the Consent Form when they received their PGT-A testing, and the Consent Form contains an arbitration provision (DE 26 at 5-8). Igenomix and Vitrolife, Inc. argue that Plaintiffs' claims fall within the scope of the arbitration provision in the Consent Form, which is also signed by Igenomix (*id.* at 9). Vitrolife, Inc., on the other hand, is not a signatory to the Consent Form; however, Vitrolife, Inc. argues that it can compel arbitration through equitable estoppel (DE 40 at 7). In addition, Defendant Vitrolife AB filed its Motion to Dismiss on October 24, 2025, arguing that Plaintiffs have not established that the Court has personal jurisdiction over it, as both general and specific jurisdiction are lacking (DE 49 at 4-17). Alternatively, Vitrolife AB seeks to compel arbitration for the same reasons that are set forth in its co-defendants' motions and argues that the Complaint is a shotgun pleading, as it impermissibly

---

[4] Counts Nine through Sixteen are mislabeled in the Complaint.

pleads facts collectively without specifying which Defendants engage in the alleged conduct (*id.* at 17-20).[5]

As to Igenomix and Vitrolife, Inc.'s Motion to Compel Arbitration, Plaintiffs maintain that their claims are not governed by the arbitration clause in the Consent Forms and that as non-signatories to the Consent Forms, Vitrolife, Inc. and Vitrolife AB cannot compel arbitration (DE 36 at 5).   Specifically, Plaintiffs argue that their claims are outside the scope of the arbitration agreement, because their claims do not arise from the services that Defendants provided to Plaintiffs (*id.* at 7-13).   Instead, their claims stem from the purportedly false and deceptive marketing and advertising Defendants used to promote PGT-A testing before any services were provided (*id.*).   Regarding Vitrolife AB's Motion to Dismiss for Lack of Personal Jurisdiction, Plaintiffs suggest that personal jurisdiction is proper under Sections 48.193(1)(a)(1), (2), and (6) of Florida's long-arm statute based on Vitrolife AB's role in the marketing and promotion of the PGT-A testing performed by Igenomix (DE 54 at 4-7).   Lastly, Plaintiffs assert that the Complaint is not a shotgun pleading, as collective pleading of allegations against Defendants who engaged in the same conduct is permissible (DE 36 at 10-20).

### A.  Defendant Vitrolife AB's Motion to Dismiss for Lack of Personal Jurisdiction

Vitrolife AB contends the Court does not have personal jurisdiction over it, because Plaintiffs have not shown that Vitrolife AB is at home in Florida or involved in any activities in Florida (DE 49 at 5-17).   Vitrolife AB argues that Plaintiffs' allegations discuss its business

---

[5] Vitrolife Group also filed a Motion to Dismiss for Lack of Personal Jurisdiction and/or to Compel Arbitration on October 24, 2025 (DE 50).   After representing to the Court at the January 20, 2026 hearing that they did not intend to pursue their claims against Vitrolife Group, Plaintiffs filed a Notice of Voluntary Dismissal Without Prejudice on January 22, 2026, dismissing their claims against Vitrolife Group (DE 68), and the Court dismissed Vitrolife Group from this action without prejudice on January 22, 2026 (DE 69).

generally but do not evidence specific contacts with Florida (*id.* at 5).  As a result, Vitrolife AB maintains there is no reason to conclude it is at home in Florida through continuous and systematic activities (*id.* at 6).

In opposition, Plaintiffs claim personal jurisdiction over Vitrolife AB exists under both general and specific jurisdiction provisions of the Florida long-arm statute (DE 54 at 4-7).  According to Plaintiffs, Vitrolife AB does not maintain a separate existence from Igenomix, which is headquartered in Miami, Florida, sharing facilities, offices, assets, services, and personnel (*id.* at 4-5).  Moreover, Plaintiffs argue that since Vitrolife AB acquired Igenomix, Vitrolife AB has controlled Igenomix and participated in the marketing and sales of its PGT-A testing, establishing continuous and systematic activities in Florida (*id.* at 4).   Plaintiffs further argue that through its false and deceptive advertising of PGT-A testing, Vitrolife AB committed a tort in Florida, and the injuries and harm based on Vitrolife AB's supposed misleading and deceptive marketing have been felt by Florida residents (*id.* at 9).  Plaintiffs also claim that subjecting Vitrolife AB to suit in Florida comports with traditional notions of fair play and substantial justice, such that the exercise of personal jurisdiction over Vitrolife AB does not offend due process (*id.* at 8-9).

### 1.  Legal Standard for Personal Jurisdiction

"As a general rule, courts should address issues relating to personal jurisdiction before reaching the merits of a plaintiff's claims."  *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 940 (11th Cir. 1997) (citation omitted).  "The determination of personal jurisdiction over a nonresident defendant requires a two-part analysis."  *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990) (citation omitted).  "First, we must examine the jurisdictional issue under the state long-arm statute."  *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 855 (11th Cir. 1990) (citation omitted).  A defendant can be subject to personal jurisdiction

under Florida's long-arm statute in two ways: (1) specific jurisdiction, and (2) general jurisdiction. *Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1203-04 (11th Cir. 2015) (citing FLA. STAT. § 48.493(1)(a), (2)). "The reach of the [Florida long-arm] statute is a question of Florida law. [F]ederal courts are required to construe [such law] as would the Florida Supreme Court." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009) (citation omitted). "If there is a basis for the assertion of personal jurisdiction under the state statute, we next determine whether sufficient minimum contacts exist to satisfy the Due Process Clause of the Fourteenth Amendment so that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Madara*, 916 F.2d at 1514 (citation and quotation omitted).

"The district court must accept the facts alleged in the complaint as true, to the extent that they are uncontroverted by the defendant's affidavits." *Cable/Home Commc'n Corp.*, 902 F.2d at 855 (citation omitted). "Absent an evidentiary hearing on a motion to dismiss for want of personal jurisdiction, the district court must first determine that the plaintiff has established a *prima facie* case of personal jurisdictional over the nonresident defendant which is capable of withstanding a directed verdict motion." *Abramson v. Walt Disney Co.*, 132 F. App'x 273, 275 (11th Cir. 2005) (citation omitted). "In making this determination, the district court must accept the plaintiff's factual allegations, unless those allegations are contested by the defendant's affidavits." *Id.* (citation omitted). "'[S]pecific factual declarations within the affiant's personal knowledge[]' . . . are sufficient 'to shift to the Plaintiff[ ] the burden of producing evidence supporting jurisdiction.'" *Mazer*, 556 F.3d at 1277. "The burden, however, does not shift back to the plaintiff when 'the defendant's affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction.'" *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013).

"[W]here the plaintiff's complaint and the defendant's affidavits conflict, the district court must construe all reasonable inferences in favor of the plaintiff." *Madara*, 916 F.2d at 1514.

### 2.   The Evidence and Allegations Set Forth by the Parties

Plaintiffs allege the following in the Complaint related to personal jurisdiction over Vitrolife AB: "Igenomix and Vitrolife AB created Vitrolife Group," "Vitrolife Group is located at Box 9080, SE-400 92, Goteborg, Sweden," and Igenomix is part of Vitrolife Group and Vitrolife, Inc., which are collectively referred to as "Vitrolife" throughout the Complaint (DE 1 ¶¶ 11-13).[6] In Plaintiffs' view, since Vitrolife AB acquired Igenomix, it "has served no separate existence or function outside of the corporate interests of Vitrolife, as evidenced by the companies' respective sharing of facilities, tools, employees, and offices" (*id.* ¶14).   Further, since the acquisition, "Vitrolife has dominated and controlled Igenomix in all respects, including marketing of its PGT-A testing and decision-making" (*id.*).   Vitrolife purportedly "employs several individuals across the United States" and "advertises its products and services (including PGT-A testing) throughout the world including the United States" (*id.* ¶ 15).   "Vitrolife and Igenomix do not maintain separateness when it comes to PGT-A testing and the marketing, promotion, and sale of testing[,]" and they "collectively market, promote, advertise and sell PGT-A testing throughout the United States and the world" (*id.* ¶¶ 19-20).   Plaintiffs contend, "The injuries, damages and/or harm upon which this action is based occurred or arose out of activities engaged in by Defendants within, affecting, and emanating from, the state of Florida" (*id.* ¶ 23).   Moreover, "Defendants have engaged, and continue to engage, in substantial and continuous business practices in the state of Florida and across the country" (*id.*).

---

[6] Only one paragraph in the Complaint contains allegations specific to Vitrolife AB, which states that it acquired Igenomix in 2021 (DE 1 ¶ 10).  All other allegations are made collectively against Vitrolife AB, Igenomix, and Vitrolife, Inc., or "Vitrolife."

In support of its challenge to personal jurisdiction, Vitrolife AB submitted a declaration by Erin Schardt (DE 53-2).  In response, Plaintiffs submitted a declaration by Allison S. Freeman, Esq. and the Vitrolife Group Interim Report, Q3 2025 (DE 55-1, 55-2).  At the January 20, 2026 hearing, the Parties confirmed that they have not requested jurisdictional discovery and that there are no direct factual challenges to the information contained in their respective declarations that the Court must resolve by way of an evidentiary hearing.  The Parties also agreed that the Court's inquiry proceeds under Florida law.

### a. Declaration of Erin Schardt

Erin Schardt is the Senior Vice President and General Manager for Vitrolife, Inc. and Igenomix (DE 53-2 ¶ 3, DE 67).  Ms. Schardt states that she has knowledge about Vitrolife AB's "business operations and relationship with its subsidiaries" (DE 53-2 ¶ 3).  Ms. Schardt attests, "Vitrolife AB is a Public Swedish Entity" and a "pure Holding entity" that does not manufacture products and does not do business in the United States (*id.* ¶¶ 4, 5).  Additionally, Vitrolife AB is a distinct entity that does not operate through Vitrolife, Inc. or Igenomix and does not sell or market products in Florida (*id.* ¶¶ 6, 7).  Vitrolife AB "does not exercise day-to-day operational control of Igenomix, the entity that provided Plaintiffs with services" (*id.* ¶ 8).  Ms. Schardt states, "Vitrolife AB is not registered with the Florida Secretary of State to transact business in Florida; conducts no business activities in Florida; does not own or lease any real property in Florida; maintains no bank account in Florida; and maintains no office or employees in Florida" (*id.* ¶ 9).  As a result, Vitrolife AB has not paid any taxes to Florida, has not appointed an agent for service of process in Florida, and has no office or place of business in Florida (*id.* ¶ 10).  According to Ms. Schardt, Vitrolife, Inc. and Igenomix do not act as an agent for Vitrolife AB in Florida (*id.* ¶¶ 11-12).  Lastly, "Vitrolife AB does not regularly conduct and/or directly solicit business in, engage in other

persistent courses of conduct in, and/or derive substantial revenue from services provided to persons in the state of Florida" (*id.* ¶ 14).

### b. *Declaration of Allison S. Freeman*

Allison S. Freeman, Esq., counsel for Plaintiffs, stated that she searched through registered trademarks in the United States and found that Vitrolife Group is not a registered trademark with the United States Patent and Trademark Office (DE 55-2 ¶¶ 2-3). However, there are two Vitrolife registered trademarks—one is owned by Vitrolife Sweden AB, and Vitrolife, Inc. owns the other (*id.* ¶¶ 4-6). Ms. Freeman also stated that Vitrolife Group did not appear as a registered fictious name with the Florida Division of Corporations pursuant to Florida Statute § 865.09 (*id.* ¶¶ 7-8). Plaintiffs also point to the following statements in the Vitrolife Group Interim Report, Q3 2025: "Vitrolife Group refers to Vitrolife AB (publ) and all its subsidiaries" (DE 54 at 9). The 2025 Interim Report states "Igenomix is a brand of Vitrolife AB specializing in reproductive genetic testing, and that its sales consist of genetic testing within its 'Genetic products group' performed in the Americas" (*id.* at 4). Additionally, "Vitrolife and Igenomix USA['s]" LinkedIn page states they are a part of Vitrolife Group "with their headquarters in Miami, Florida" (*id.* at 4-5).

### 3. General Jurisdiction

Under Section 48.193(2) of Florida's long-arm statute, a defendant "engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity." § 48.193(2), FLA. STAT. (2016). "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919

(2011) (quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 317 (1945)).   "[O]nly a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there."  *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).   "With respect to a corporation, the place of incorporation and principal place of business are paradigm . . . bases for general jurisdiction."  *Id.* (citation and quotation omitted and cleaned up).   Even if the defendant's place of incorporation and principal place of business are not in Florida, "[g]eneral personal jurisdiction exists when a defendant 'is engaged in substantial and not isolated activity within this state . . . whether or not the claim arises from that activity.'"  *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1352 (quoting § 48.193(2)).   "General personal jurisdiction is based on a defendant's substantial activity in Florida without regard to where the cause of action arose."  *Id.* (citation omitted).

Plaintiffs' arguments regarding the Court's general jurisdiction over Vitrolife AB are unavailing.  At the outset, Plaintiffs' unrebutted allegations in the Complaint alone may establish the exercise of personal jurisdiction over Vitrolife AB; but, Vitrolife AB provided Ms. Schardt's declaration, which directly contradicts Plaintiffs' jurisdictional allegations.  For instance, Plaintiffs claim that Vitrolife AB does not maintain a separate corporate identity from its subsidiary, Florida-based Igenomix.  "[A] foreign parent corporation is not subject to the jurisdiction of a forum state merely because a subsidiary is doing business there."  *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1272 (11th Cir. 2002).  Rather, "[c]ourts exercise general personal jurisdiction over the foreign company defendant when that defendant has operational control over its subsidiary. . . . The level of control over the subsidiary must be 'high and very significant,' and if there is a 'semblance' of independence from the parent company, jurisdiction will not attach."  *SX Holdings, LLC v. iContainers USA, Inc.*, No. 22-CIV-20824, 2025 WL 901245, at *3 (S.D. Fla. Mar. 25, 2025) (citations omitted).  Ms. Schardt's declaration states that although Igenomix is a

subsidiary of Vitrolife AB, they are distinct entities, and Vitrolife AB does not exercise day-to-day operational control of Igenomix.  She further states that Igenomix does not act as an agent of Vitrolife AB in Florida.

Similarly, Plaintiffs allege that Vitrolife AB is directly involved in the marketing and sales of Igenomix's PGT-A testing to Florida residents.  Yet, Ms. Schardt's declaration states that Vitrolife AB *does not sell or market products in Florida*, conducts no business activities in Florida, does not own or lease any real property in Florida, maintains no bank account in Florida, and maintains no office or employees in Florida.  Even more, Vitrolife AB has not paid any taxes to Florida, does not regularly conduct and/or directly solicit business in Florida, and does not derive substantial revenue from services provided to Florida residents.  *See Carmouche*, 789 F.3d at 1205 ("A foreign corporation cannot be subject to general jurisdiction in a forum unless the corporation's activities in the forum closely approximate the activities that ordinarily characterize a corporation's place of incorporation or principal place of business.").  These statements are diametrically opposed to Plaintiffs' contentions and thus, operate as "specific factual denials that challenge each and every factual allegation raised by [Plaintiffs]."  *Mazer*, 556 F.3d at 1277.

By offering Ms. Schardt's declaration to challenge the facts establishing jurisdiction, the Court does not need to take Plaintiffs' allegations in the Complaint as true.  *See Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000) (explaining that in assessing personal jurisdiction, the Court must accept the allegations as true "to the extent that they are uncontroverted by the Defendant's affidavits").  Ms. Schardt's declaration was sufficient to shift the burden to Plaintiffs to produce evidence demonstrating personal jurisdiction.  In response, Plaintiffs argue that "Vitrolife AB's 2025 Interim Report for the Vitrolife Group states that it is a global provider of genetic testing solutions, that Igenomix is a brand of Vitrolife AB specializing in reproductive

13

genetic testing, and that its sales consist of genetic testing within its 'Genetic products group' performed in the Americas" (DE 54 at 4). They also offer Ms. Freeman's declaration, which does not even mention Vitrolife AB, except to note that it owns a Vitrolife registered trademark. The statements in the Interim Report, however, neither contradict Vitrolife AB's lack of activity directed at Florida nor show operational control over Igenomix. *See Lee-Bolton v. Koppers Inc.*, No. 10-CIV-253, 2013 WL 11522040, at *5 (N.D. Fla. Sept. 9, 2013) ("The fact that a holding company discusses profits, losses, and operations as joint operations with its subsidiary in press releases, web sites, SEC filings or financial reports for the plain understanding of its shareholders, giving the appearance that the companies are intertwined, does not alter their legal relationship or demonstrate sufficient operational control to justify personal jurisdiction under an agency theory."); *Yellow Pages Photos, Inc. v. Ziplocal, LP*, No. 12-CIV-755, 2012 WL 5830590, at *5 (M.D. Fla. Nov. 16, 2012) ("As for the statements in the website, annual report, and press release, courts do not rely on such statements as reliable evidence that the parent exercises 'operational control' necessary to confer personal jurisdiction."); *Abramson*, 132 F. App'x at 276 ("Evidence of operational control is not satisfied where the foreign corporation's policy statements merely establish goals for its subsidiaries . . . ."). The Court is not persuaded that the statements in the Interim Report or on a website are sufficiently specific or reliable to undercut the facts set forth in Ms. Schardt's declaration. Considering the uncontroverted evidence, Vitrolife AB does not engage in substantial activity in Florida, through Igenomix or otherwise.

### 4.  Specific Jurisdiction

Florida's long arm statute provides several ways in which a Florida court can exercise specific jurisdiction over a non-resident defendant:

> A person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits

himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from any of the following acts:

    1.   Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.

    2.   Committing a tortious act within this state.

    . . .

    6.   Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, either:

        a.  The defendant was engaged in solicitation or service activities within this state; or

        b.  Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

§§ 48.193(1)(a)(1), (2), (6). "Under Florida's long-arm statute, a person is subject to the jurisdiction of Florida courts 'for any cause of action arising from' certain listed conduct, including: 'operating, conducting, engaging in, or carrying on a business or business venture in this state. . . .'" *Villarino v. Joekel*, No. 24-11124, 2025 WL 2329959, at *5 (11th Cir. Aug. 13, 2025) (quoting § 48.193(1)(a)(1) and cleaned up) (per curiam). Further, "an entity is subject to specific personal jurisdiction if, among other things, it 'commits a tortious act within this state.'" *World Media All. Label, Inc. v. Believe SAS*, No. 24-12079, 2025 WL 2102017, at *2 (11th Cir. July 28, 2025) (quoting § 48.193(1)(a)(2) and cleaned up)) (per curiam). Under Section 48.193(1)(a)(6), a Defendant may be subject to personal jurisdiction for "causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, . . . the defendant was engaged in solicitation or service activities within this state." *Villarino*, 2025 WL 2329959, at *5 (quoting § 48.193(1)(a)(6)) (cleaned up).

Vitrolife AB argues that Plaintiffs cannot demonstrate specific jurisdiction, because Vitrolife AB did not commit a tort in Florida and does not do business in Florida (DE 49 at 4). Vitrolife AB points out that Plaintiff did not specifically plead that Vitrolife AB committed a tortious act that occurred in Florida; rather Plaintiff pled, "The injuries, damages and/or harm upon which this action is based occurred or arose out of activities engaged in by Defendants within, affecting, and emanating from, the state of Florida" (*id.* at 8 (quoting DE 1 ¶ 23) (emphasis removed)).   In Vitrolife AB's view, there are no allegations showing its contacts in Florida, as Vitrolife AB is a holding company that does not operate in Florida or have a presence in Florida (*id.* at 8-11).   Vitrolife AB claims that Plaintiffs' IVF services "were rendered by Igenomix, not . . . Vitrolife AB[,]" and Plaintiffs decision to "lump[] these two entities into 'Defendants' does not change the source of their alleged torts" (*id*. at 12).   Rebutting this argument, Plaintiffs claim there is specific jurisdiction over Vitrolife AB, as the allegations demonstrate that Vitrolife AB participated in the false and misleading sales of PGT-A testing, thereby committing a tort in Florida (DE 54 at 5).   Plaintiffs also contend that Vitrolife AB caused injury in Florida through the sale of PGT-A testing, thereby establishing personal jurisdiction (*id.* at 7).

Notwithstanding Plaintiffs' contentions, the Court does not have personal jurisdiction over Vitrolife AB under Section 48.193(1)(a)(1).   As Ms. Schardt's declaration explains, and as discussed *infra*, Vitrolife AB is a holding company that does not sell or market products in Florida and does not do business in the United States (DE 53-2 ¶¶ 5-6).   Similarly, Ms. Schardt's declaration states that Vitrolife AB does not exercise operational control over Igenomix, such that Igenomix functions as the mere instrumentality of Vitrolife AB (*id.* ¶ 8).   This evidence demonstrates that based on its own contacts, Vitrolife AB did not operate or conduct its own business for profit in Florida and did not maintain an office or employees in Florida.  *See Future*

*Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000) ("In order to establish that a defendant is 'carrying on business' for the purposes of the long-arm statute, the activities of the defendant must be considered collectively and show a general course of business activity in the state for pecuniary benefit.").   Vitrolife AB also did not serve as an agent of Igenomix for purposes of personal jurisdiction.  *See Herederos De Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, 43 F.4th 1303, 1312 (11th Cir. 2022) (explaining that there was no personal jurisdiction over a parent corporation, because the subsidiary was independent and not the parent's alter-ego).  Therefore, personal jurisdiction under Section 48.193(1)(a)(1) is improper.

    "Section 48.193(1)(a)(2) provides that a nonresident defendant is subject to personal jurisdiction in Florida "for any cause of action arising from . . . [c]omitting a tortious act within [Florida]."  *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1353 (citation and emphasis omitted). Plaintiffs allege, "Vitrolife AB falsely and misleadingly sold their PGT-A testing product, which is a tortious act, throughout the United States, including to individuals in Florida which is where testing was ultimately conducted when purchased by consumers" (DE 54 at 7 (citing DE 1 ¶¶ 8-9, 23 and 33)).  In addition, "Vitrolife AB transacted business through a single internet website, as well as brochures and other marketing materials to sell their PGT-A testing product in a false and misleading way throughout the United States, including in Florida, for their laboratory located in Miami, Florida" (DE 54 at 7).  Vitrolife AB counters that it cannot be subject to this provision of the long-arm statute, because it is a Swedish entity, and any alleged tort was committed outside of Florida (DE 56 at 5-6).  Vitrolife AB does not acknowledge that the Eleventh Circuit has "consistently held that, under Florida law, a nonresident defendant commits a tortious act in Florida by performing an act outside the state that causes injury within Florida."  *Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1272 (11th Cir. 2022).  Plaintiffs' allegations collectively establish

that Vitrolife AB participated in the marketing and sales of the PGT-A testing, from Sweden or elsewhere, through its website and its alleged deceptive and misleading advertising caused economic injury to consumers in Florida, who purchased the testing. *See id.* at 1273 (discussing *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1353, which the Eleventh Circuit described as holding "allegations regarding the sale of infringing goods to Florida residents *through the accessible website* sufficed to establish specific personal jurisdiction under § 48.193(1)(a)(2)" (emphasis in original)).

Even if the allegations in the Complaint were sufficient to state a *prima facie* case for jurisdiction under *Louis Vuitton Malletier, S.A.*, they were sufficiently controverted by Ms. Schardt's declaration. The unrefuted facts before the Court demonstrate that Vitrolife AB does not sell or market products in Florida and does not conduct or solicit business in Florida. These facts directly challenge Plaintiffs' allegations that Vitrolife AB sold PGT-A testing to Florida residents, conducted PGT-A testing in Florida, and distributed brochures and other marketing materials for PGT-A testing that reached Florida residents. *See Meier ex rel. Meier*, 288 F.3d at 1269 ("Where, as here, the defendant submits affidavits to the contrary, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction unless those affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction." (citation omitted)). After the burden shifted back to Plaintiffs to show Vitrolife AB engaged in activity, whether on its own, or through operational control of Igenomix, as part of the alleged tort, Plaintiffs have offered no such evidence.[7] Lastly, Plaintiffs' argument that "because Defendants have caused injury in Florida by the acts and omissions with the sale of their PGT-A in Florida, specific

---

[7] The 2025 Vitrolife Group Interim Report provided by Plaintiffs does not rebut the facts set forth in Ms. Schardt's declaration for all the reasons previously stated.

jurisdiction also exists under §48.193(1)(a)(6)" in a single, conclusory sentence fares no better (DE 54 at 7).  Again, the prevailing evidence shows Vitrolife AB did not sell or market PGT-A testing in Florida, and Plaintiffs have not produced facts demonstrating that Igenomix's contacts should be imputed to Vitrolife AB through an agency theory.  Plaintiffs simply have not shown that Vitrolife AB, either on its own or through operational control of Igenomix, has sufficient contacts to bring it within the specific jurisdiction of Florida's long-arm statute.

### 5.  Due Process

To satisfy the due process analysis, "it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (citing *Kulko v. Superior Ct. of California In & For City & Cnty. of San Francisco*, 436 U.S. 84, 97-98 (1978)).  "[T]he constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (citing *International Shoe Co.,* 326 U.S. at 316).  "A tribunal's authority depends on the defendant having such contacts with the forum that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'" *Del Valle*, 56 F.4th at 1274 (citations omitted).

> In specific personal jurisdiction cases, we apply the three-part due process test, which examines: (1) whether the plaintiff's claims "arise out of or relate to" at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant 'purposefully availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'

*Louis Vuitton Malletier, S.A.*, 736 F.3d at 1355 (citations omitted).

Because there is no personal jurisdiction, general or specific, over Vitrolife AB pursuant to Florida's long-arm statute, there is no need to determine if Due Process is satisfied.  *See Melgarejo v. Pycsa Panama, S.A.*, 537 F. App'x 852, 862 (11th Cir. 2013) ("Because the district court properly concluded there is no basis for specific personal jurisdiction . . . we do not reach the second question of the personal jurisdiction analysis—whether such an exercise of personal jurisdiction would be constitutional.").  Nevertheless, in this case, for all the reasons discussed herein, Vitrolife AB's Florida contacts, which the uncontroverted evidence shows are virtually none, "do not 'closely approximate the activities that ordinarily characterize a corporation's place of incorporation or principal place of business' . . . ."  *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1318 (11th Cir. 2018) (citation omitted).  Moreover, Vitrolife AB is based in Sweden, and Plaintiffs have not demonstrated that Vitrolife AB, on its own or through an agent, was sufficiently connected to Florida or did business in Florida to comport with the requirements of Due Process. The records lack sufficient evidence to show that Plaintiffs' claims arise out of or relate to Vitrolife AB's Florida contacts or that Vitrolife AB purposefully availed itself of the benefits of conducting business in Florida.  Therefore, it is respectfully recommended that Vitrolife AB's Motion to Dismiss for Lack of Personal Jurisdiction be **GRANTED** and that all claims against Vitrolife AB be **DISMISSED WITHOUT PREJUDICE**.[8]

### B.  Defendants Igenomix and Vitrolife, Inc.'s Motions to Compel Arbitration

Defendants Igenomix and Vitrolife, Inc. contend that Plaintiffs' claims are "committed to the jurisdiction of the arbitrators to be appointed by the American Arbitration Association" (DE

---

[8] Since it is respectfully recommended that Vitrolife AB be dismissed from this action for lack of personal jurisdiction, the undersigned does not address the remaining arguments in Vitrolife AB's Motion to Dismiss.  If, however, Plaintiffs have shown personal jurisdiction over Vitrolife AB, the analysis in the remainder of this Report and Recommendation would apply to Vitrolife AB as well.

26 at 1, DE 49, DE 50).  In support of this argument, Igenomix and Vitrolife, Inc. explain that each

Plaintiff signed the Consent Form that has an arbitration provision, which is fully enforceable (DE

26 at 5-10, DE 49, DE 50).  In response, Plaintiffs point out that "the arbitration clause is not

enforceable by non-signatory Vitrolife, Inc., who is simply not a party or third-party beneficiary

of the Consent Form" (DE 36 at 2, DE 54).  Next, Plaintiffs contend that their claims fall outside

the scope of the arbitration agreement (DE 36 at 3-4, DE 54 at 14).  Plaintiffs also assert that the

arbitration clauses are procedurally and substantively unconscionable, because they do not

preserve access to all available remedies, such as equitable and declaratory relief (*id.* at 16).

The Consent Forms signed by Plaintiffs and Igenomix, which contained the arbitration

provision, have two variations – one governed by California law and one governed by Florida law.

The arbitration provision in the Consent Forms governed by Florida law stated, in relevant part:

> I acknowledge that any legal controversy, dispute, or disagreement arising out of the services provided by Igenomix USA or any subsidiary thereof shall be settled by binding arbitration by the American Arbitration Association, under the applicable Arbitration Rules then in effect. Information may be obtained, and claims may be filed in the State of Florida office of the American Arbitration Association. All disputes shall be decided under the laws of the State of Florida.

(DE 26-1 at 7, DE 26-3 at 5, DE 26-7 at 6).  The arbitration provision in the Consent Forms

governed by California law stated, in relevant part:

> I/we acknowledge that any legal controversy, dispute or disagreement arising out of the services provided by Igenomix USA or any subsidiary thereof shall be settled by binding arbitration by the American Arbitration Association, under the applicable Arbitration Rules then in effect. Any award of the arbitrator(s) may be entered as a judgment in any court of competent jurisdiction. Information may be obtained and claims may be filed in any California office of the American Arbitration Association. Any such arbitration shall take place at the American Arbitration Association office San Francisco, California; or if no such office exists, at the American Arbitration Office closest to Igenomix USA's corporate headquarters at the time of the filing of the arbitration. All disputes shall be decided under the laws of the State of California.

(DE 26-2 at 7, DE 26-4 at 4, DE 26-5 at 1, DE 26-6 at 4).

On January 20, 2026, the Court held a hearing on the pending Motions, at which the Parties agreed that the Consent Forms contain a valid agreement to arbitrate claims that fall within their scope, that the signatories to the arbitration agreement are Plaintiffs and Igenomix, and that the Court can consider the language in the Consent Forms as part of the Motion, even though they were not attached to the Complaint but were referenced throughout (DE 65).  The Parties further agreed that there is no delegation clause in the relevant arbitration provisions, so the Court decides the issue of arbitrability (*id.*).  Defendants conceded that they did not raise any argument in their Motion that under the arbitration clause, the arbitrator should decide arbitrability and therefore, any such argument has been waived.  *See Bodine v. Cook's Pest Control Inc.*, 830 F.3d 1320, 1324 (11th Cir. 2016) (explaining that a defendant must properly raise a delegation clause otherwise it is waived, and the "court must determine whether the arbitration agreement is enforceable." (citation omitted)).[9]  Lastly, the Parties agreed that to the extent the Court must look to principles of state law, the legal analysis under California and Florida law – the two relevant state laws invoked by the Consent Forms – produces the same result.

### 1.  Legal Standard

Under the Federal Arbitration Act ("FAA"), "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration . . . shall be valid, irrevocable, and enforceable."  9 U.S.C. § 2 (2022).  Further, a party "may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such

---

[9] Both Parties clearly asserted in their filings that the arbitration clauses do not contain a delegation clause (DE 36 at 4; DE 40 at 3); *see also Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1213 (11th Cir. 2011) (finding the defendant's contention a "non-starter" when it argued on appeal that the district court should not have decided arbitrability, after requesting that the district court decide for itself whether the dispute was subject to arbitration in the proceedings below and invoking the doctrine of invited error).

agreement." *Id*. § 4.  If a case is referred to arbitration, a court "shall. . . stay the trial of the action until such arbitration has been had." *Id*. § 3.  "The FAA embodies a 'liberal federal policy favoring arbitration agreements.'" *Hemispherx Biopharma, Inc. v. Johannesburg Consol. Invs*., 553 F.3d 1351, 1366 (11th Cir. 2008) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*., 460 U.S. 1, 24 (1983)).  "The role of the courts is to 'rigorously enforce agreements to arbitrate[;]'" therefore, the presence of a valid arbitration agreement raises a strong presumption of enforcement. *Id*. at 1366 (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc*., 473 U.S. 614, 630-31 (1985).

"Under federal law, arbitration is a matter of consent, not coercion." *Fridman v. 1-800 Contacts, Inc*., 554 F. Supp. 3d 1252, 1256 (S.D. Fla. 2021) (quotation and citation omitted). "Because the FAA is at bottom a policy guaranteeing the enforcement of private contractual arrangements, we look first to whether the parties agreed to arbitrate a dispute, not to general policy goals, to determine the scope of the agreement." *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d at 1214 (citation omitted).  "The courts are not to twist the language of the contract to achieve a result which is favored by federal policy but contrary to the intent of the parties." *Goldberg v. Bear, Stearns & Co.*, 912 F.2d 1418, 1419-20 (11th Cir. 1990).  "[T]he parties will not be required to arbitrate when they have not agreed to do so." *Id*.  "Because 'arbitration is a matter of contract,' determining whether a claim falls within the scope of an arbitration agreement 'is generally a matter of state law' . . . ." *Entrekin v. Internal Med. Assocs. of Dothan, P.A.*, 689 F.3d 1248, 1251 (11th Cir. 2012).

### 2.  Whether Plaintiffs' Claims Come Within the Scope of the Arbitration Clauses

First, the Parties dispute whether Plaintiffs' claims in the Complaint fall within the scope of the arbitration clauses contained in the Consent Forms.  Defendants contend Plaintiffs' claims

fall within the language of the arbitration provision, because the language is broad and applies to "any legal controversy, dispute, or disagreement arising out of the services" (DE 26 at 8). Plaintiffs do not contest that they signed the Consent Forms with the arbitration provisions (DE 36 at 8). Rather, Plaintiffs argue that their fraud, misrepresentation, and deceptive marketing and promotion claims are not within the scope of the arbitration provisions, as they do not arise from the services provided by Defendants (*id.*).

In Florida, "[t]wo basic types of arbitration provisions have emerged: (1) provisions with language and application narrow in scope, and (2) provisions with language and application broad in scope." *Jackson v. Shakespeare Found., Inc.*, 108 So. 3d 587, 593 (Fla. 2013) (citation omitted). "An arbitration provision that is considered to be narrow in scope typically requires arbitration for claims or controversies 'arising out of' the subject contract." *Id.* A narrow arbitration provision "appl[ies] only to 'those claims that have a direct relationship to a contract's terms and provisions.'" *Leidel v. Coinbase, Inc.*, 729 F. App'x 883, 887 (11th Cir. 2018) (citation omitted). "On the other hand, the phrase 'arising out of or relating to' the contract has been interpreted broadly to encompass virtually all disputes between the contracting parties, including related tort claims." *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 637 (Fla. 1999) (citation omitted). A broad arbitration provision "appl[ies] to 'claims that are described as having a 'significant relationship' to the contract . . . .'" *Leidel*, 729 F. App'x at 887 (citation omitted).

The arbitration clauses in the Consent Forms call for "any legal controversy, dispute, or disagreement *arising out of* the services provided by Igenomix" to be submitted to arbitration (DE 26-1 at 7, DE 26-2 at 7, DE 26-3 at 5, DE 26-4 at 4, DE 26-5 at 1, DE 26-6 at 4, DE 26-7 at 6 (emphasis added)). Since the arbitration clauses utilize the narrower "arising out of" language, "the provision is limited to disputes that arise under the [services themselves] – disputes that have

a direct relationship to the [services'] 'terms and provisions' – not disputes that stem from the parties' relationship more generally." *Joseph v. Communicare Healthcare Servs. Inc.*, No. 21-CIV-60164, 2021 WL 1565537, at *2 (S.D. Fla. Mar. 18, 2021), *report and recommendation adopted,* No. 21-CIV-60164, 2021 WL 1564429 (S.D. Fla. Apr. 21, 2021).

Based on the allegations in the Complaint, Plaintiffs' claims go to supposedly "false, deceptive, unfair, and misleading advertising marketing, and promotion of Defendants' preimplantation genetic testing[,]" and "Defendants' unfair and deceptive business practices arising from Defendants' marketing and sale of PGT-A testing" (DE 1 ¶¶ 1-2, at 73 ¶ 204, at 74 ¶ 211). Plaintiffs launch similar allegations for each of their consumer protection claims, contending that "consumers would not have paid for Defendants' PGT-A testing but for Defendants' false and misleading representations, omissions, and promotion as detailed throughout this Complaint" (*id.* ¶¶ 206, 208, 249, 252, 259, 265-66, 275-78, 280, 291, 302, 308-09). With respect to their fraud claims, Plaintiffs contend Defendants made a series of false statements, including:

> Defendants' PGT-A testing is 98 to 99% accurate; Defendants' PGT-A testing improves pregnancy rates; Defendants' PGT-A testing increases implantation rates; Defendant's PGT-A testing increases delivery rates; Defendant's PGT-A testing increases the chance of a healthy baby; Defendants' PGT-A testing benefits every couple, especially individuals of advanced maternal age; Defendants' PGT-A testing increases the success of IVF; Defendant's PGT-A testing provides more viable embryos; Defendants' PGT-A testing decreases the time and cost of IVF; Defendants' PGT-A testing decreases the rate of miscarriage; and Defendants' PGT-A testing is superior to all others.

(*id.* ¶ 339). Further, "Defendants intentionally suppressed and concealed material facts about their PGT-A," and "Defendants knew about the problems and issues with PGT-A" (*id.* ¶ 348). Plaintiffs allege that "[h]ad Plaintiffs . . . known the truth, and of the material facts that Defendants omitted to disclose to them, they would not have purchased PGT-A from Defendants. . . ." (*id.* ¶ 350).

It is clear from the Complaint that these claims are centered around the marketing and advertising that Defendants engaged in to persuade Plaintiffs to purchase their testing (*see e.g.*, *id.* ¶¶ 18, 22-23, 59, 95, 117, 149-50, 155, 170, 182, 186, 191).  Plaintiffs maintain that these claims do not arise from the services that were later provided by Defendants, such as the PGT-A testing. Instead, these claims arise from the purported consumer fraud by Defendants that occurred before any goods or services were provided to Plaintiffs, which in turn, induced Plaintiffs to purchase Defendants' services.  Plaintiffs' arguments are compelling for several reasons.  First, Florida law has long recognized separate and distinct torts based on antecedent fraudulent representations, independent of any breach of a contract that was subsequently entered into by the parties.  *See HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996) ("Fraudulent inducement is an independent tort in that it requires proof of facts separate and distinct from the breach of contract. It normally 'occurs prior to the contract and the standard of truthful representation placed upon the defendant is not derived from the contract,' i.e., 'whether the defendant was truthful during the formation of the contract is unrelated to the events giving rise to the breach of the contract.'" (citations omitted)).  Here too, Plaintiffs' allegations consistently target Defendants' representations about the efficacy and benefits of their testing used to entice Plaintiffs into purchasing the testing, not an attack on whether Defendants performed under the contract by providing the agreed upon services.  The purported fraud that Plaintiffs complain of is "extraneous to the contract[,]" not "interwoven" with it.  *Id.* at 1240 (citation omitted).

Second, the duties that Plaintiffs allege Defendants violated do not arise from the contract but instead, from an independent statutory obligation.  For example, in Count Three, Plaintiffs allege that Defendants violated the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA") (*id.* ¶¶ 245-56).  "A consumer claim under FDUTPA must have three elements: (1) a deceptive act

or unfair practice; (2) causation; and (3) actual damages." *Lombardo v. Johnson & Johnson Consumer Companies, Inc.*, 124 F. Supp. 3d 1283, 1290 (S.D. Fla. 2015). "A deceptive act or practice is one that is likely to mislead consumers and an unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Fla., Inc.*, 103 F. Supp. 3d 1343, 1354 (S.D. Fla. 2015). Importantly, FDUPTA provides a right of action to any entity that can prove the elements of the claim, not simply a direct consumer. *See Fla. Emergency Physicians Kang & Assocs., M.D., Inc. v. United Healthcare of Fla., Inc.*, 526 F. Supp. 3d 1282, 1301 (S.D. Fla. 2021) (finding an entity that is not a direct customer can bring suit following the 2001 amendments to FDUPTA). Of particular import here, Defendants' duty not to engage in deceptive acts likely to mislead consumers is imposed – not by the contract at issue, the Consent Forms but– by a statutory obligation based on public policy that is owed not just to those in privity of contract with Defendants, but the public generally. *See Leidel*, 729 F. App'x at 888 ("[A] claim does not have a nexus to a contract if it pertains to the breach of a duty otherwise imposed by law or in recognition of public policy, such as a duty under the general common law owed not only to the contracting parties but also to third parties and the public." (quoting *Jackson*, 108 So. 3d at 593)). The very nature of Plaintiffs' FDUPTA and similar claims counsels against the existence of a direct relationship between these claims and the services provided under the Consent Forms.

Defendants counter that Plaintiffs' causes of action arise from the sale of the testing services, and any claim challenging those services must arise from the services provided. Defendants also point to Plaintiffs' allegations that the Consent Forms themselves contain the alleged misrepresentations with which Plaintiffs take issue. Lastly, Defendants argue that for

Plaintiffs to have actionable fraud-based claims, Plaintiffs must have obtained Defendants' services to meet various elements, such as causation and damages, and require reference to the obligations created by the Consent Forms. But, Defendants' arguments require a departure from the narrow interpretation of the arbitration clauses, to which the Court is constrained. Defendants essentially implore the Court to find that these claims have a significant relationship to the services they provided. Indeed, Defendants' arguments may have proven persuasive if the arbitration clauses had the broader language – arising under and relating to – analyzed in *Jackson*, 108 So. 3d at 595. There, the Florida Supreme Court found that the Jacksons' allegedly fraudulent statements to the Shakespeare Foundation, which it relied upon in entering into the contract to buy the Jacksons' land, had "a significant relationship to the contract" and brought the fraud claim "within the scope of the contract's broad arbitration provision." *Id*. The Florida Supreme Court discussed how "the reliance element of the claim emanates from the transaction from which the contract arose, and the damages element of the claim arises from the execution and existence of the contract itself." *Id.* It cannot be overlooked, however, that the arbitration provision in this case is fundamentally different, as it is narrower in scope due to the absence of the "relating to" language. Nor can Defendants prevail on the argument that any doubt about the arbitration clauses' application must be resolved in favor of arbitration under the FAA. *See Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d at 1214 ("Even though there is that presumption in favor of arbitration, '[t]he courts are not to twist the language of the contract to achieve a result which is favored by federal policy but contrary to the intent of the parties.' That means 'the parties will not be required to arbitrate when they have not agreed to do so.'" (citations omitted)).

The arbitration provisions in the Consent Forms closely resemble the provisions at issue in *Leidel*. Although not binding precedent, the Eleventh Circuit found that the narrow arbitration

clause did not encompass claims for Defendant's failure to monitor, investigate, detect, and report activity by third-party users of its financial services website based on duties imposed by the Bank Secrecy Act and its implementing regulations.  729 F. App'x at 888.  The Eleventh Circuit noted, "Leidel's claims rely on obligations allegedly imposed by law and in recognition of public policy to persons who are strangers to the User Agreements" and found "those claims [failed to] meet the more stringent 'direct relationship' standard applicable to arbitration provisions that are narrow in scope."  *Id.*  At the January 20, 2026 hearing, Defendants argued that *Leidel* is distinguishable, because Plaintiff was a non-signatory, third-party, and the arbitration agreement was between the defendant and the fraudster.  Although true, there is nothing in the opinion that suggests these facts had a material impact on the Court's reasoning.  To the contrary, the Eleventh Circuit relied heavily on *Siefert*, 750 So.2d at 641, where the Florida Supreme Court found that the plaintiff's claims were outside the scope of an arbitration provision, to which both the plaintiff and the defendant were signatories.  Considering the arbitration provision in the Consent Forms is narrow in scope under Florida law, Defendants have not established that Plaintiffs' claims for unfair and deceptive trade practices in Counts One through Ten and fraud in Counts Thirteen and Fourteen have a direct relationship to the services provided by Defendants, such that the dispute in question "was an immediate, foreseeable result of the performance of contractual duties."  *Telecome Italia, SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1116 (11th Cir. 2001).

Plaintiffs' claims for breach of implied and express warranty in Counts Eleven, Twelve, and Fifteen, and unjust enrichment in Count Sixteen, however, are of a different character.  With respect to their breach of warranty and usability claims, Plaintiffs allege in the Complaint that "Defendants, as the provider and seller of their PGT-A testing, impliedly warranted to Plaintiffs and the Class that Defendants' PGT-A was of merchantable quality and fit for its ordinary and

intended use" (DE 1 ¶¶ 320, 328).  Plaintiffs claim, "Defendants breached the implied warranty of merchantability in connection with the sale of PGT-A[,]" and "[w]hile Defendants advertise, market, and promote that their PGT-A testing is accurate and reliable, it is not, rendering it unsuitable for use" (*id.* ¶ 322).  Plaintiffs "can establish privity with Defendants because Plaintiffs purchased PGT-A from Defendants" (*id.* ¶¶ 324, 334).  Similarly, Plaintiffs contend, "Defendants understood that Plaintiffs . . . would require that their PGT-A testing provide reliable and accurate information regarding their embryos and Defendants delivered their PGT-A tests to Plaintiffs . . . understanding the need to meet these requirements" (*id.* ¶¶ 325, 335).  According to Plaintiffs, "[d]espite Defendants' express warranties about accuracy and reliability, its PGT-A testing is not accurate or reliable" and "therefore not what Defendants represented it to be" (*id.* ¶¶ 365-66).  Regarding the unjust enrichment claim, the Complaint alleges that Defendants "received a measurable benefit at the expense of Plaintiffs and Class members in the form of payment for PGT-A testing[,]" and "Defendants accepted monetary benefits from Plaintiffs . . . at the detriment of Plaintiffs" (*id.* ¶¶ 373-74).

Unlike the deceptive and unfair trade practices claims and the fraud claims, these allegations are directly linked to the services provided by Defendants — the PGT-A testing, itself. Put differently, by Plaintiffs' own allegations, the breach of implied warranty and merchantability, breach of the implied warranty of usability, breach of express warranty, and unjust enrichment claim "arise out of" Defendants' services, because they are inextricably intertwined with the administration of the PGT-A testing under the contract, instead of Defendants' advertising and marketing practices.  Moreover, these claims arise from the agreement to provide PGT-A testing services, and without the contract between Plaintiffs and Igenomix, no such relationship would exist.  *See Hearn v. Comcast Cable Commc'ns, LLC*, 992 F.3d 1209, 1214-16 (11th Cir. 2021)

(explaining that the plaintiff's claim under the Fair Credit Reporting Act fell within the scope of an arbitration agreement in the defendant's subscriber agreement and that the defendant could not have allegedly committed a tort but for the pre-existing agreement).  Plaintiffs cannot take issue with the services they received, that is the PGT-A testing, while trying to avoid arbitration provisions that encompass disputes arising out of those very same services.  In sum, Plaintiffs' claims for breach of implied warranty of merchantability in Count Eleven, breach of implied warranty of usability in Count Twelve, breach of express warranty in Count Fifteen, and unjust enrichment in Count Sixteen are subject to arbitration with Igenomix, and it is respectfully recommended that Igenomix's Motion to Compel Arbitration be **GRANTED IN-PART** with respect to those claims.

### 3.   Whether Vitrolife, Inc. Can Invoke Equitable Estoppel

It is undisputed that Vitrolife, Inc. is not a signatory to the Consent Forms containing the arbitration clauses.  Nevertheless, Vitrolife, Inc. argues that even as a non-signatory, it should be permitted to compel arbitration of Plaintiffs' claim under the doctrine of equitable estoppel.  In Vitrolife, Inc.'s view, it can compel arbitration, because Plaintiffs' Complaint alleges that all Defendants collectively committed the acts giving rise to their claims without distinguishing or identifying any separate conduct by Vitrolife, Inc. (DE 40 at 7).  Plaintiffs counter that equitable estoppel does not apply, because their claims are not within the scope of arbitration provision, and a non-signatory is not allowed to expand an arbitration provision to encompass non-arbitrable claims (DE 36 at 7).

"The issue of whether a non-signatory to an agreement can use an arbitration clause in that agreement to force a signatory to arbitrate a dispute between them is controlled by state law." *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 845 F.3d 1351, 1354 (11th Cir.

2017) (citation omitted).  "[T]here are certain limited exceptions, such as equitable estoppel, that allow nonsignatories to a contract to compel arbitration."  *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999), *abrogated on other grounds by Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (citation omitted).  "These exceptions recognize that 'the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted' if the signatory was not compelled to also arbitrate the dispute brought against a non-signatory."  *A-Team Trappers, L.L.C.*, 2023 WL 4846598, at *3. Under Florida law, a non-signatory can invoke an arbitration clause "when the signatory to the contract containing the arbitration clause raises allegations of concerted conduct by both the non-signatory and one or more of the signatories to the contract.'"  *Shetty v. Palm Beach Radiation Oncology Assocs.-Sunderam K. Shetty, M.D., P.A.*, 915 So. 2d 1233, 1235 (Fla. Dist. Ct. App. 2005)).  "Courts must look to whether the plaintiff's claims against the signatory and non-signatory both arise out of the same factual allegations when determining if equitable estoppel applies in these circumstances."  *A-Team Trappers, L.L.C.*, 2023 WL 4846598, at *3.

It is evident that a non-signatory cannot compel the arbitration of claims that fall outside the scope of the arbitration clause.  *See Leidel*, 729 F. App'x at 886-87 ("[I]n order to compel arbitration under a theory of equitable estoppel, the party seeking to compel arbitration must show both that the plaintiff is relying on a contract to assert its claims and that the scope of the arbitration clause in that contract covers the dispute.").  As set forth above, Plaintiffs' claims for breach of implied warranty of merchantability in Count Eleven, breach of implied warranty of usability in Count Twelve, breach of express warranty in Count Fifteen, and unjust enrichment in Count Sixteen fall within the scope of the arbitration clause, and Igenomix, as a signatory to the

32

arbitration agreement, may compel arbitration with respect to them.  Vitrolife, Inc. too, as a non-signatory, may compel arbitration of these claims under the doctrine of equitable estoppel.

In their Complaint, Plaintiffs levy virtually all of their allegations Igenomix, Vitrolife AB, Vitrolife Group, and Vitrolife, Inc. collectively as "Defendants" (*see generally* DE 1).  This collective style of pleading persists throughout Plaintiffs' merchantability, warranty, usability, and unjust enrichment claims, where Plaintiffs broadly allege "Defendants" without identifying any specific conduct attributable to each entity (*id.* ¶¶ 320, 322-26, 328, 331-37, 362-68, 371-77).  In reading these allegations, Plaintiffs inextricably intertwine non-signatory Vitrolife, Inc.'s purported conduct with that of the signatory, Igenomix.  *See Escobal v. Celebration Cruise Operator, Inc.*, 482 F. App'x 475, 476 (11th Cir. 2012) (affirming the application of equitable estoppel as the plaintiff's claims against the non-signatory were "inextricably intertwined" with his claims against the signatory).  Moreover, because the Complaint treats Vitrolife, Inc. and Igenomix as largely the same actor, allowing Igenomix to arbitrate Plaintiffs' claims, but not Vitrolife, Inc., could lead to irreconcilable results.  "[Precluding the application of equitable estoppel] allow[s] Plaintiff[s] to effectively render the arbitration proceedings between [them and Igenomix] meaningless, because in the event [they] received an unfavorable decision [Plaintiffs] could merely relitigate the exact same issue against [Vitrolife, Inc.]."  *A-Team Trappers, L.L.C.*, 2023 WL 4846598, at *3.  Accordingly, it is respectfully recommended that Vitrolife, Inc. be permitted to invoke the doctrine of equitable estoppel to compel arbitration of Plaintiffs' claims for breach of implied warranty of merchantability in Count Eleven, breach of implied warranty of usability in Count Twelve, breach of express warranty in Count Fifteen, and unjust enrichment in Count Sixteen and that Vitrolife, Inc.'s Motion to Compel Arbitration be **GRANTED IN-PART** with respect to these claims.

### 4.  Enforceability of the Arbitration Clauses

In a final attempt to avoid arbitration, Plaintiffs unconvincingly argue that the arbitration clauses are procedurally and substantively unconscionable as part of an adhesion contract presented in "an environment of duress" (DE 26 at 14-16).  Courts routinely reject arguments that arbitration clauses are procedurally unconscionable because it is a "take it or leave it" contract. *See Bhim v. Rent-A-Ctr., Inc.*, 655 F. Supp. 2d 1307, 1315 (S.D. Fla. 2009) (finding no procedural unconscionability even though the contract was presented as a "take it or leave it" basis when the plaintiff could not show that she lacked employment alternatives).  Further, nothing in the record suggests that Plaintiffs were under duress when presented with the Consent Forms.  *See Emps. Ins. of Wausau v. Able Green, Inc.*, 749 F. Supp. 1100, 1104 (S.D. Fla. 1990) ("The purpose behind the unconscionability doctrine is 'prevention of oppression and unfair surprise.'" (quotation omitted)).  Similarly, the Court is unconvinced that the arbitration clauses are substantively unconscionable, because they are silent as to Plaintiffs' rights to seek injunctive or declaratory relief.  At bottom, Plaintiffs fail to show that the arbitration clauses unfairly favor Defendants or materially alter Plaintiffs' statutory rights and remedies.  *See Garcia v. Church of Scientology Flag Serv. Org., Inc.*, No. 18-CIV-13452, 2021 WL 5074465, at *7 (11th Cir. Nov. 2, 2021) ("A contract is substantively unconscionable if its terms 'unreasonably favor' one party and 'are so unfair' that a court should not enforce them." (citation omitted and cleaned up)).  As such, the arbitration clauses are not procedurally and substantively unconscionable and should be enforced.

### III.  <u>CONCLUSION</u>

Based on the foregoing, it is respectfully recommended that Defendant Vitrolife AB's Motion to Dismiss for Lack of Personal Jurisdiction (DE 49) be **GRANTED** and that Defendant Vitrolife AB be **DISMISSED WITHOUT PREJUDICE** under Federal Rule of Civil Procedure

12(b)(2).   It is further respectfully recommended that Defendants Igenomix USA, Inc. and Vitrolife, Inc.'s Motions to Compel Arbitration (DE 26, 27) be **GRANTED IN-PART and DENIED IN-PART**.   It is further respectfully recommended that Plaintiffs' claims for breach of implied warranty of merchantability in Count Eleven, breach of implied warranty of usability in Count Twelve, breach of express warranty in Count Fifteen, and unjust enrichment in Count Sixteen against Igenomix USA, Inc. and Vitrolife, Inc. be submitted to arbitration.   As to Plaintiffs' remaining claims against Igenomix USA, Inc. and Vitrolife, Inc. for unfair and deceptive trade practices in Counts One through Ten and fraud in Counts Thirteen and Fourteen, it is further respectfully recommended that Defendants Igenomix USA, Inc. and Vitrolife, Inc.'s Motions to Compel Arbitration (DE 26, 27) be **DENIED**.[10]

## IV.   **OBJECTIONS**

The Parties will have fourteen (14) days from the date of this Report and Recommendation to file written objections, if any, with the Honorable William P. Dimitrouleas, United States District Judge.   Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in this Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report, except upon grounds of plain error, if necessary, in the interest of justice.   *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

---

[10] Section 3 of the FAA indicates a stay is mandatory for arbitrable claims.  9 U.S.C. § 3.  "When confronted with litigants advancing both arbitrable and nonarbitrable claims, however, courts have discretion to stay nonarbitrable claims."  *Klay v. All Defendants*, 389 F.3d 1191, 1204 (11th Cir. 2004).  In the Eleventh Circuit, "it is well established that a district court may order arbitration and refuse to stay nonarbitrable proceedings."  *Id.*  "Crucial to this determination is whether arbitrable claims predominate or whether the outcome of the nonarbitrable claims will depend upon the arbitrator's decision."  *Id.*

**RESPECTFULLY SUBMITTED** in Chambers in Miami, Florida on this 27th day of January, 2026.

_____
ELLEN F. D'ANGELO
UNITED STATES MAGISTRATE JUDGE

cc:     All Counsel of Record

36